David A. Katz, SBN 112874
433 N. Camden Drive, Suite 600
Beverly Hills, CA 90210
(310) 279-5111/FAX (310) 279-5112
Attorney for Defendant/Appellant Kyn Naope
katznassoc@aol.com

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 15-133-GEB |
| | ) | |
| Plaintiff, | ) | MOTION FOR BAIL PENDING |
| | ) | APPEAL AND FOR TEMPORARY |
| v. | ) | STAY OF SURRENDER WHILE THE |
| | ) | COURT CONSIDERS THIS MOTION; |
| KYN NAOPE, | ) | DECLARATION; EXHIBITS; |
| | ) | APPPENDIX |
| Defendant. | ) | |
| | ) | Courtroom: Judge Burrell |

TO THE HONORABLE GARLAND E. BURRELL, JR., U.S. DISTRICT JUDGE OF THE EASTERN DISTRICT OF CALIFORNIA AND TO THE U.S. ATTORNEY FOR THIS DISTRICT: PLEASE TAKE NOTICE that Defendant/Appellant Kyn Naope, through counsel, hereby moves and will move for bail pending appeal, and for a temporary stay of surrender while the Court considers this Motion.

This motion is based on the following memorandum, declaration, exhibits, appendix and the entire file and record in this case and the related cases of *Mitchell* and *Parks et al*.

Dated: January 3, 2018                    Respectfully submitted,

/s/ David A. Katz_____
David A. Katz
Counsel for Kyn Naope

i

1

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Memorandum Of Points And Authorities .......................................................................... 1

I.     Factual and Procedural Background ........................................................................ 1

II.    This Court Should Grant Bail Pending Appeal Because Naope Has Met
       The Standards For Bail During The Pendency of An Appeal ................................... 2

       A.     Appellant Will Not Flee Or Pose A Danger To Anyone Or The
              Community ................................................................................................ 3

       B.     The Appeal Raises Substantial Questions Of Law Or Fact ......................... 3

              1.     The Plea Agreement Does Not Bar The Appeal ............................... 3

              2.     There Is A Strong Basis To Argue That Mgdesyan Was
                     Ineffective ...................................................................................... 4

                     a.     Mgdesyan Was Ineffective In Failing To Challenge
                            The Loss Attributed To Naope ............................................... 5

                     b.     Mgdesyan Was Ineffective In Failing To Challenge
                            The Role Ascribed To Naope ................................................. 7

                            i.     Mgdesyan Was Ineffective In Failing To Challenge
                                   The Role Ascribed To Naope In The PSR .................. 7

                            ii.    Mgdesyan Was Ineffective In Failing To Have
                                   The Court Determine Whether The Persons That
                                   Naope Supposedly Controlled, Were Criminally
                                   Culpable ............................................................... 9

                            iii.   Mgdesyan Was Ineffective Because He Did Not
                                   Mention, Much Less Insist The Court Use, The
                                   Seven-Factor Test In The Guidelines To Determine
                                   If A Role Enhancement Was Warranted ................... 10

                            iv.    Mgdesyan Was Ineffective When He Failed To
                                   Object That, For Purposes Of The Role Enhancement,
                                   The Government Treated Naope Differently From
                                   The Alleged Co-conspirators In The *Parks* Case
                                   Before Judge Nunley ............................................. 11

                            v.     Mgdesyan Was Ineffective In Failing To Object
                                   To The Government's Statement That Naope Was
                                   "The Organizer And Leader" Of The Scam .............. 13

                     c.     Mgdesyan Was Ineffective In Failing To Object To
                            The Sophisticated Means Enhancement ............................... 13

i.      Mgdesyan Failed To Object That A Sophisticated Means Enhancement Does Not Apply Simply Because The Conspiracy Involved, Or Co-conspirators Used, Sophisticated Means.............. 13

ii.     Use Of A Shell Company Is Not Sophisticated *Per Se*, And Is Not Sophisticated When It Is Not Used To Hide Assets Or Transactions ....................... 14

d.      Mgdesyan Was Ineffective In Failing To Object That Criminal History Category II Overstated Naope's Criminal History................... 15

3.      Mgdesyan's Failure To Raise The Foregoing Points Cannot Be Deemed To Be A Strategic Decision.......................... 16

4.      Naope Was Prejudiced By Mgdesyan's Ineffectiveness.................. 16

5.      Other Instances Of Mgdesyan's Ineffectiveness That Further Prejudiced Naope .............................................. 17

a.      Mgdesyan Misstated A Key Fact .......................... *17*

b.      *Mgdesyan Ineffectively Did Not Contest Erroneous Factual Assertions Or Request An Evidentiary Hearing* ...... 18

c.      Mgdesyan Failed To Obtain Discovery To Make The Arguments Necessary To Show The Errors In The PSR's And The Government's Factual Presentation And Guidelines Analysis ............................................ 18

d.      Mgdesyan Failed To Support His 5H1.6 Request With Any Case Law ..................................................... 19

Conclusion ............................................................................................ 23

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Champion v. United States*, 319 Fed.Appx.443 (8th Cir. 2009) ....................................... 7

4

*Owens v. United States*, 387 F.3d 607 (7th Cir. 2004) .......................................... 17

5

*United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000) ................................... 22

6

*United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) ........................................ 21

*United States v. Attar*, 38 F.3d 727 (4th Cir. 1994) ..................................... 3-4

7

*United States v. Brown*, 944 F.2d 1377 (7th Cir. 1991) .................................... 11

8

*United States v. Dominguez*, 296 F.3d 192 (3rd Cir. 2002) ............................... 21

9

*United States v. Fernandez-Angulo*, 897 F.2d 1514 (9th[h] Cir. 1990) (en banc) .............. 18

10

*United States. v. Fuller*, 879 F.2d 1215 (1st[t] Cir. 1990) ................................... 11

11

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003).  ................................... 3

12

*United States v. Gonzalez*, 1989 Westlaw 86021 (S.D.N.Y. 1989)  ............................. 21

*United States v. Handy*, 752 F. Supp. 561 (E.D.N.Y. 1990)  ............................... 21

13

*United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994) ..................................... 20

14

*United States v. Horob*, 735 F.3d 866 (9th Cir. 2013) (per curiam)  ............................. 15

15

*United States v. Jennings*, 711 F.3d 1144 (9th Cir. 2013)  ............................... 15

16

*United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001) ................................... 5

17

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992)  ................................... 21

18

*United States v. Leandre*, 132 F.3d 796 (D.C. Cir. 1998)................................... 23

19

*United States v. Leon,* 341 F.3d 928 (9th Cir. 2003)...................................20-22

*United States v. McLaughlin*, 203 Fed. Appx. 891 (9th Cir. 2006)  ............................. 17

20

*United States v. Montoya,* 908 F.2d 450 (9th Cir. 1990) ................................... 3

21

*United States v. Mustread*, 42 F.3d 1097 (7th Cir. 1994) ................................... 10

22

*United States v. Nunez*, 223 F.3d 956 (9th Cir. 2000)................................... 4

23

*United States v. Pruitt*, 32 F.3d 431 (9th Cir. 1994)  ................................... 4

24

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010).   ............................. 5

25

*United States v. Stapleton, 268 F.3d 597 (8th Cir. 2001)*  ............................... 5

26

*United States v. Sweeting*, 213 F.3d 95 (3rd Cir. 2000)................................... 22

*United States v. Tanke*, 742 F.3d 1296 (9th Cir. 2014)................................13-14

27

*United States v. Taylor, Sr.*, 12-CR-375-TLN (E.D. Cal.)  ............................... 6

28

*United States v. Valencia-Andrade*, 72 F.3d 770 (9th Cir. 1995)   ................................... 16

*United States v. Whitney*, 673 F.3d 965 (9th Cir. 2012)  .................................... 9

*United States v. Wiora*, 1999 U.S. App. LEXIS 4041 (9th Cir. 1999).............................. 18

**Statutes**

18 U.S.C. §371 ................................................................................................. 1

18 U.S.C. §2255 ....................................................................................... passim

18 U.S.C. §3143(b) ............................................................................................ 3

Fed.R.Crim.P. 32(c)......................................................................................... 18

U.S.S.G. §1B1.3(a)(1)(B) .................................................................................. 5

U.S.S.G. §2B1.1(b)(10(C) ...............................................................................  14

U.S.S.G. §5H1.6(B)................................................................................... passim

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Factual and Procedural Background.

Kyn Naope pleaded guilty to a one-count information charging him with conspiracy to commit mail fraud (18 U.S.C. §371) as part of a scheme to receive unemployment checks to which he was not entitled.   Although the PSR recommended a sentence of five years of probation, the district court imposed five years of custody.

Naope was not charged with this offense until July 2015, almost five years after he unlawfully received the unemployment checks.   Later that year, in December 2015, Naope's healthy wife died during routine cosmetic surgery.   That left Naope as the sole caretaker of two young boys, now aged 2 ½ and 10.

The PSR found there were no suitable family members to care for Naope's children. PSR ¶17.   That is even truer today.   Naope's brother, from whom Naope is estranged, was recently arrested in a drug case.   That brother was living with Naope's stepmother and using the home for the drug crime.   Naope has searched for a non-family solution for his child-care predicament.   The most promising possibility was his deceased wife's former roommate who had been a close friend, and her husband.   Although they initially expressed a desire to take in his children, in early November they decided they could not do so, primarily because their own son has autism.

Since then, Naope has been working to place his 10-year-old son in a boarding school in the Fall.   He hopes that, until then, he can persuade his wife's friend and her husband to take in the 10-year-old until school begins.   Naope also has been working to arrange for his 2½-year-old son to live with his nanny, who has three youngsters of her own.

Naope asked the district court for a stay of surrender from January 5 until February 28 to make the foregoing child-care and financial arrangements for his children.   The court denied that motion on December 22 (the order was entered on ECF on December 26) and on December 29, after considering a motion for reconsideration, again declined to stay surrender until February 28.

After the sentencing hearing, Naope retained undersigned counsel, David A. Katz, in October and filed a notice of appeal.   The available record and discovery led Katz to believe

there is a basis for an appeal (as well as a section 2255 motion) due to the ineffectiveness of Naope's former attorney, George Mgdesyan, in his preparation for and his presentation at the sentencing hearing.   Mgdesyan's ineffectiveness includes his failure to obtain relevant discovery and to investigate and address prejudicial factual and legal errors in the PSR and in the government's sentencing memorandum and argument.   Katz Decl. ¶4.

Naope's new counsel has pursued the appeal diligently, trying to collect additional information and documents in support of Naope's claims.   Katz promptly contacted Naope's sentencing lawyer to obtain his file, which included the PSR and a flash drive with over 8,000 pages of discovery (but no index to the files).   Katz Decl. ¶5.   Mgdesyan had not challenged *any* aspect of the PSR, including the Sentencing Guidelines enhancements, which supposedly produced a Guidelines range of 63-78 months.   Instead, Mgdesyan's sentencing memorandum only asked the district court to grant a five-year downward departure based solely on Naope's personal circumstances.   That is, Mgdesyan sought straight probation based solely on 5H1.6, which permits a downward departure where a defendant's caretaking support is irreplaceable to his or her family, and the departure effectively would address the loss of caretaking support.

On November 13, Katz asked the government for an index for the files on the flash drive, also for the case report, and for *Brady* material.   Exh. A.   The government never responded to those requests.   Katz Decl. ¶6.   Katz obtained the transcripts of the change-of-plea and sentencing hearings.   Katz filed motions with U.S. District Judge Burrell in *Mitchell* and U.S. District Judge Nunley in *Parks, et al.* for access to sealed records about the alleged co-conspirators in two cases related to Naope's case.   Judge Burrell denied that request in *Mitchell*, and the matter is awaiting a decision in the *Parks* case.

## II.   This Court Should Grant Bail Pending Appeal Because Naope Has Met The Standards For Bail During The Pendency of An Appeal.

A defendant seeking bail on appeal must show (a) by clear and convincing evidence, that if released he is not likely to flee or pose a danger to the safety of any other person or the community, and (b) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal or dismissal or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.   18 U.S.C. §3143(b)(1); *United States v. Garcia*, 340 F.3d 1013, 1015 (9th

Cir. 2003).

**A.** **Appellant Will Not Flee Or Pose A Danger To Anyone Or The Community.**

There is clear and convincing evidence that Naope will not flee and that he poses no danger to any other person or the community. The district court found that he will not flee and that he poses no danger to anyone or the community when it permitted him to remain at liberty in the community from his sentencing on September 29, 2017, until January 5, 2018. There has been no change in circumstances that would change this conclusion. On the contrary, Naope's need to make arrangements for his two minor children reinforces this conclusion.

Further, Naope's law-abiding conduct since his release on bond in July 2015, and again when he was approved for continued release after his sentencing on September 29, shows that he poses no risk of flight or danger to the community. Throughout this litigation, for over two years, Naope has always presented himself to the Court as required. Notably, the government and Probation were both satisfied in July 2015 and September 2017 that Naope was neither a flight risk nor a danger to anyone or to the community. Katz Decl. ¶7.

**B.** **The Appeal Raises Substantial Questions Of Law Or Fact.**

Naope's appeal will raise substantial questions of law and fact – i.e., "fairly debatable" questions – likely to result in reversal of the current sentencing and an order for a new sentencing hearing. *United States v. Montoya*, 908 F.2d 450, 450 (9th Cir. 1990) (a substantial question is one that is fairly debatable or doubtful). The appeal is not for the purpose of delay.

**1.** **The Plea Agreement Does Not Bar The Appeal.**

Although the government-drafted plea agreement includes a waiver of appeal and collateral attack, the agreement expressly permits Naope to raise "non-waivable claims." Plea Agreement at 8. Counsel's ineffective representation in preparation for and at the sentencing hearing is a non-waivable claim. *See*, *e.g.*, *United States v. Attar*, 38 F.3d 727, 732 (4th Cir. 1994) ("Nor do we think such a defendant can fairly be said to have waived his right to appeal his sentence on the ground that the proceedings following entry of the guilty plea were conducted in violation of his right to counsel, for a defendant's agreement to waive appellate

review of his sentence is implicitly conditioned on the assumption that the proceedings following entry of the plea will be conducted in accordance with constitutional limitations."); *see also United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994) (finding that a waiver of appeal did not block defendant's §2255 claim of ineffective assistance alleging "mishandling of the sentencing proceedings").   Further, Naope could not have known or reasonably expected, when he signed the plea agreement, that his attorney Mgdesyan would be ineffective months later in his preparation for and his presentation at the sentencing hearing.

In opposition to Naope's motion for access to sealed documents, the government relied on *United States v. Nunez*, 223 F.3d 956 (9th Cir. 2000), to argue that the waiver barred Naope's appeal, but *Nunez* does not support the government's argument.   First, Nunez claimed his attorney was ineffective in plea negotiations, not at sentencing.   *Id.* at 959.   His waiver in the plea agreement reasonably would be construed to waive claims about events that *pre*-dated the waiver.   Here, by contrast, Naope's claims are based on counsel's *post*-waiver ineffectiveness and other errors that occurred months after the guilty pleas.   Second, *Nunez* did not hold that a waiver bars all claims of ineffectiveness.   On the contrary, the *Nunez* court wrote, "We do not decide whether a defense counsel's incompetence may be so egregious as to render a defendant's waiver involuntary, thereby permitting an ineffective assistance claim on direct appeal."   *Id.* at 959.   Naope expects to show that Mgdesyan's representation in the sentencing proceedings was egregiously ineffective and meets the *Nunez* standard.

**2.      There Is A Strong Basis To Argue That Mgdesyan Was Ineffective.**

Apparently content to rest his sentencing argument entirely on Naope's personal circumstances, Mgdesyan did not challenge *any* of the factual and legal errors that led to an overstated loss amount, an overstated role, an erroneous enhancement for sophisticated means, and an overstated criminal history.   Moreover, Mgdesyan did not bring to the district court's attention case law showing that disputed sentencing enhancements which, as here, have a disproportionate impact on the length of a sentence, must be supported by clear and convincing evidence.   *See United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001).   Nor did Mgdesyan ask the court to "make a factual finding as to whether the government carried its burden of proof" on loss and role.   *See United States v. Stapleton, 268 F.3d 597, 598 (8th*

*Cir. 2001)* (holding that some investigation and verification is required for disputed statements in the PSR).

### a.   Mgdesyan Was Ineffective In Failing To Challenge The Loss Attributed To Naope.

To determine the loss amount, courts must "make factual determinations establishing the scope of each defendant's joint undertaking and the amount of losses reasonably foreseeable to each defendant." *United States v. Treadwell*, 593 F.3d 990, 1003 (9th Cir. 2010). Usually, in a conspiracy, the government must prove the scope of the joint undertaking and loss by a preponderance of evidence, *id.* at 1000, but here, where the enhancement has a disproportionate impact on the sentence, it must be proven by clear and convincing evidence. *Jordan*, 256 F.3d at 927.

The loss is determined by "all reasonably foreseeable acts and omissions of others that were: (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; *and* (iii) reasonably foreseeable *[by the defendant in question]* in connection with that criminal activity." U.S.S.G. §1B1.3(a)(1)(B). The discovery supports the argument that Naope did not reasonably foresee or participate in a fraud over $120,000.[1]

Rather than make any effort to show the court that Naope was responsible for a relatively small loss, Mgdesyan acquiesced in a "factual basis" in Naope's plea agreement stating, "The total amount of UI benefit checks cashed as a result of the scheme was over $2,500,000." This statement, not corrected by counsel in his sentencing memorandum nor at the sentencing hearing, left the misleading impression that *Naope* was responsible for a loss in excess of 2.5 million dollars. Indeed, the government exploited Mgdesyan's ineffectiveness to write the following about Naope: "Perhaps understandably, in his sentencing memorandum the defendant does not discuss the almost $3.5 million *he* stole from the State of California pursuant to *his* scheme to defraud. . . . [This is one of the] enhancements . . . properly assessed by the probation officer and uncontested by the defendant." CR 50 at 1 (government

---

[1]  Naope's confession (Exh. B) and other discovery show that he received about $45,000 in UI checks, from which Mitchell and his gang took a cut from him, as Naope knew they did from his brother (Exh. B, Bates 891) and godmother. Naope would have reasonably foreseen and believed that, all three together, received less than $120,000 in their UI checks.

sentencing memorandum) (italics supplied).

Although Katz wrote the government on November 13, 2017, asking where in the 8,000 pages of discovery there was any evidence that such a large amount should be attributed to Naope, Exh. A, the government did not respond.

Notably, Mitchell had no reason to inform Naope about the scale of Mitchell's scheme, including his use of six or seven different companies.   Nonetheless, over $3.4 million in loss was attributed to Naope (and ordered as restitution from him), as though he bore responsibility for every applicant who, through Mitchell, submitted a false claim that he or she worked for Sona or some other company.

Further, it appears the government treated loss differently for Naope than it did for defendants in related cases.   In *U.S. v. Taylor, Sr.*, 12-CR-375-TLN (E.D. Cal.), the government conceded that since Taylor Sr. – described as a "manager" in the scheme – only recruited individuals who would claim they had worked for Financial Builders Emporium (FBE) (apparently another company name that Mitchell used), Taylor should only be liable for the UI claims made as to FBE.   Taylor Sr.'s own UI claim, based on a false claim that he had worked at Peco, apparently was not counted.   Nor were UI claims counted if made by other people who also falsely said they worked at Peco, even though Taylor Sr. seemed aware of them.   As a result, Taylor Sr. was deemed responsible for a loss amount of $1,046,960. See *United States v. Taylor, Sr.,* 12-CR-375-TLN (E.D. Cal.), Docket #198.   Yet the loss associated with FBE also was attributed to Naope, who had no involvement with or knowledge of FBE**.**   Had Mgdesyan brought this disparity in treatment to the court's attention, the loss from FBE and Peco would be subtracted from the Sona total, reducing the loss attributable to Naope below $1,500,000.   That would take at least *2 points* off his Guidelines level and alone reduce the low end of his range from 63 months to 51 months.

But even this analysis overstates the loss properly attributable to Naope.   Naope had sold Sona, the company he had owned (as Naope explained in his confession in March 2011), to a man named Eric Taylor.   Exh. B (Bates 890-91).   A father and son both with the last name Taylor but different first names were in Mitchell's gang, *see United States v. Taylor Sr., and Taylor Jr. et al.,* 12-CR-375-TLN (E.D. Cal.).   Further, there is no evidence that Naope

knew how many people would be signed up for unemployment claims through Sona.   In late 2009, agents discovered hundreds of unopened letters in the P.O. Box for Sona including letters from the EDD, mailed after the transfer of Sona to Taylor.   Thus, it is evident that the existence of this mail had *not* alerted Naope to Taylor's and Mitchell's activity with Sona and was not good cause to attribute to Naope all the "Sona losses."

> **b.      Mgdesyan Was Ineffective In Failing To Challenge The Role Ascribed To Naope.**

In several respects, Mgdesyan was ineffective in failing to argue and show that a role enhancement was unwarranted.

> **i.      Mgdesyan Was Ineffective In Failing To Challenge The Role Ascribed To Naope In The PSR.**

Mgdesyan was ineffective in failing to object to the PSR's erroneous description of Naope's role.   *Cf. Champion v. United States*, 319 Fed.Appx. 443, 446 (8th Cir. 2009) (even though counsel was ineffective, affirming the denial of a §2255 petition based on counsel's failure to object to a leadership enhancement because the facts readily supported the enhancement, and thus the petitioner was not prejudiced).

The PSR justified the 4-level increase for role as follows:

> "Naope agreed in the factual basis attached to the plea agreement that he recruited others to participate in the scheme.   His computer contained spreadsheets that detailed the names of individuals that he oversaw as an organizer.   These individuals participated in the scheme as 'managers' and the spreadsheet contained the names of the fake employee accounts that they managed.   As Naope participated in an extensive scheme, created shell companies, and recruited other individuals into the scheme, who in turn recruited more people for Naope and provided a portion of the UI benefits to him upon receipt, and the criminal activity involved five or more participants, a four-level increase is warranted."

PSR ¶24.   Despite factual errors in this statement and the absence of discovery to support it, Mgdesyan failed to contest this depiction of Naope's role.

The spreadsheets contained names of individuals, but there was no evidence that Naope oversaw these people "as an organizer."   Some individuals had given their personal information to Naope, but he just passed the information to Mitchell, who generated the false EDD forms.   Naope did *not* give instructions or orders to these individuals or direct their actions.

The PSR states that Naope "recruited other individuals into the scheme, who in turn recruited more people for Naope and provided a portion of the UI benefits to him upon receipt."   PSR ¶24.   The factual basis in the plea agreement states that Naope "recruited" "two individuals" "as fictitious employees for Sona."   However, according to the discovery, only two people who had heard about the scheme from Naope (his brother Kynyada and his godmother Stephany Mickey) got checks, and they were never charged.   Exh. C (Bates 3549). Naope did not recruit them, but merely told them about an opportunity.   Moreover, Mickey told interviewing agents that, although she provided to Naope some names, social security numbers, and dates of birth, *she* filled out the EDD claim forms, both for herself and for the people *she* recruited.   Exh. C. She did not say that Naope gave her instructions on how to fill out the forms.   Mickey stated she gave one $400 check to Naope -- she perhaps gave him a few hundred dollars more, the summary of her interview leaves that unclear, Exh. C -- but otherwise she paid Naope *no* proceeds from her UI benefits or from the UI benefits that her recruits received.   Bates 3550.   Mgdesyan failed to correct the above misleading statements in the PSR.[2]

The PSR states that Naope "created shell companies," incorrectly insinuating that Naope created the shell companies for Mitchell's scheme.   Of various companies Naope created, the discovery shows that Mitchell only exploited one – Sona, which Taylor had bought from Naope.   Exhs. B & D.   Mgdesyan failed to correct this error in the PSR that Naope "created shell companies for Mitchell's scheme."

The PSR opines that "the criminal activity involved five or more participants."   PSR ¶24.   Although *Mitchell's conspiracy* may have involved five or more participants, under the discovery provided, Naope could have "led" at most only two persons (though for reasons described below, his actions did not merit any leadership adjustment).   Although there is no

---

[2] Further evidence of Naope's lesser role is in documents showing that participants interviewed by agents did not know or identify Naope.   See e.g. Bates 3479-87 (agents interviewed a Ms. Nieto who had filed an application for UI benefits that falsely listed Sona Entertainment as her last employer, Bates 3480; she told the agents what she did and whom she dealt with, never mentioning Naope; they then showed her a photo display with Naope's photo and she said she did not recognize anyone from the display (Bates 3481).

basis in the discovery for the opinion in the PSR, Mgdesyan failed to point out the error.

The PSR states, "Agents identified Naope's cousin, Mitchell, as the person who taught Naope how to carry out the scheme and who was also involved in the same type of scheme for his own benefit."   PSR ¶12.   This statement gives the erroneous impression that Mitchell ran a separate conspiracy.   In fact, though, Mitchell was the kingpin of a single scheme in which Naope was a low-level player.   Naope passed on names and information to Mitchell. Mitchell and his gang arranged for those individuals to receive UI benefits (but it appears most applicants received nothing, e.g. Exh. B), and Mitchell and his gang exacted from Naope a cut of the UI benefits that Naope received.   Mitchell managed Naope as one of the many things that Mitchell did as part of his single, large conspiracy.   Mgdesyan, however, never corrected the PSR's erroneous description of Naope's role.

Mgdesyan not only failed to address any of these factual errors in the PSR, he failed to address the role adjustment at all.   The government took advantage of this ineffectiveness too, writing to the court, "[Naope] does not speak to his role as an organizer or leader of criminal conduct involving five or more participants.   Those enhancements are properly assessed by the probation officer and uncontested by the defendant."   CR 50 at 1.   Worse, without objection, the government then misrepresented at sentencing that Naope was *the* leader and organizer, Exh. E (RT at 7), when in fact Mitchell was.

> ii. **Mgdesyan Was Ineffective In Failing To Have The Court Determine Whether The Persons That Naope Supposedly Controlled, Were Criminally Culpable.**

To receive a leadership enhancement, it is not enough that the defendant's role was important or integral in the offense.   There must be evidence that he had control over other persons who were criminally culpable.   See *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) ("even a defendant with an important role in an offense cannot receive an enhancement unless there is also a showing that the defendant had control over others").

However, Mgdesyan never requested such a finding, and as a result the district court never made that finding.   Although "a participant is any person *criminally responsible* for an offense, whether or not he was convicted," *United States v. Mustread*, 42 F.3d 1097 (7th Cir. 1994), here, the two people that Naope allegedly controlled – his brother and his godmother –

1  were not only "not convicted," they also were never charged or otherwise found criminally

2  responsible.    Although Naope told some people about a chance to obtain financial aid, those

3  were the only persons who received any checks, according to the discovery.    When

4  interviewed, Ms. Mickey made clear she was in control of what she did. Exh. C.

5          iii.    **Mgdesyan Was Ineffective Because He Did Not Mention,
6                  Much Less Insist The Court Use, The Seven-Factor Test
                    In The Guidelines To Determine If A Role Enhancement
7                  Was Warranted.**

          The Guidelines set forth a seven-factor test to impose a +4 role enhancement for an

8  aggravated leadership role:    (1) the defendant's exercise of decision-making authority; (2) the

9  nature of the defendant's participation in the offense; (3) the defendant's recruitment of

10  accomplices; (4) the defendant's claimed right to a larger share of the fruits of the crime; (5)

11  the degree of the defendant's participation in planning or organizing the offense; (6) the nature

12  and scope of the illegal activity; and (7) the degree of control and authority the defendant

13  exercised over others.    Under this test, Naope should not have received the role enhancement.

14  Mgdesyan, however, did not mention, much less employ, this seven-factor test to argue that

15  Naope should not be given +4 for role.

16          As noted above, the PSR gives the impression that Naope recruited others to the

17  scheme.    Specifically, it says Naope told some people they could make easy money filing a

18  UI claim, as Naope had himself done, and then people came to him "like roaches."    Exh. B at

19  4.    But the only evidence that Naope recruited anyone was that an officer had used that word

20  in summarizing Naope's interview.    Unlike other portions of the summary, which often

21  quotes Naope, the word *recruited* was not in quotation marks, indicating that Naope did not

22  use this word.    Although Naope's new counsel asked the government on November 13 to

23  provide the agent notes of that interview, to see if it supported the claim of recruitment, Exh.

    A, the government has not provided the notes.

24          Evidence for the other six factors was totally lacking. Naope did not exercise any

25  "decision-making authority," and his participation was minor.    He merely passed information

26  on to Mitchell.    He received a very small percentage of the proceeds – about $45,000, or less

27  than 1% of the proceeds of Mitchell's scam.    Exh. D.    There is no evidence that Naope

28

planned or organized Mitchell's scam.   Naope did not give orders or instructions to participants in Mitchell's conspiracy, and he did not supervise participants' actions.   Indeed, he was unaware of their identities and had no relationship to the vast majority of individuals involved in Mitchell's scheme.

Even assuming *arguendo* Naope exercised some degree of control over some criminally responsible individuals, a leadership enhancement would still be unwarranted. The purpose of the aggravated role enhancement is to assess penalties for the relative involvement of an individual in the scheme.   It is not appropriate to give to a middleman, with levels of leadership *above him*, an aggravated role enhancement.   See *U.S. v. Brown*, 944 F.2d 1377, 1380 (7th Cir. 1991) (reversing a role enhancement, and finding that a "middleman" in a drug operation with two levels of distributors above him should not be given a role enhancement); *U.S. v. Fuller*, 879 F.2d 1215, 2120-21 (1st Cir. 1990) (reversing a role enhancement, and requiring, before applying an enhancement for an "organizer or leader," a finding of the presence of specific criminal underlings or subordinates).   At most, Naope was a middleman.

                iv.     **Mgdesyan Was Ineffective When He Failed To Object That, For Purposes Of The Role Enhancement, The Government Treated Naope Differently From The Alleged Co-conspirators In The *Parks* Case Before Judge Nunley.**

The +4 role adjustment that Naope received is larger than the aggravating role adjustments given to alleged co-conspirators who apparently exerted real control in the scheme.   For example, before Judge Nunley,[3] the government argued for a *lesser* role for Walters and Taylor Sr. than for Naope, and both received a smaller role enhancement. Walters received +3, compared to Naope's +4, even though, according to the government, "trial evidence conclusively established . . . [Walters'] title was manager, voluminous records kept as part of the scheme identified the fraudulent claimants he managed, witnesses . . . testified that he recruited them to the scheme, accompanied them to cash fraudulent checks, and split the resulting proceeds, and testimony and phone records provided that [Walters]

---

[3] The government first charged Mitchell, whose case was assigned to Judge Burrell.   The government then charged Mitchell's underlings in *Parks et al.*, which was assigned to Judge Nunley.   After Naope was indicted years later, his case was assigned to Judge Burrell.

managed significant parts of the fraud by calling the EDD and knowing when and where fraud proceeds were delivered."   CR 12-375-TLN, Docket Number 295.

By contrast, there is no record or discovery showing that Naope had any title (such as manager), that Naope accompanied fraudulent claimants to any bank, that Naope oversaw the splitting of proceeds with coconspirators, that Naope called the EDD when people had problems, or that Naope knew when and where fraud proceeds were delivered.   It appears that Mgdesyan was utterly unaware that Naope received a higher leadership adjustment than did Walters.

Michael Taylor Sr. also was assessed +3 in his PSR, which the government apparently asked for at his sentencing, even though it considered Taylor Sr. to be a "manager" of a number of fraudulent claimants, and according to one of those claimants, "Taylor Sr. recruited her, controlled the checks distributed by EDD, brought her the funds once the claim address was changed, split the money in an amount he determined, and told her what to say to authorities."   CR 12-375-TLN, Docket Number 198 at 4.   By contrast, there is no record or discovery showing that Naope had any title, controlled any checks distributed by EDD, brought funds to anyone, controlled any division of proceeds, or instructed anyone on how to respond to authorities.   Again, Mgdesyan seemed unaware of, and took no steps to find out about, the disparity in the way a role enhancement was applied to Naope and to other, higher level defendants in the scam.

> **v.      Mgdesyan Was Ineffective In Failing To Object To The Government's Statement That Naope Was "The Organizer And Leader" Of The Scam.**

At the sentencing hearing, the government stated that Naope "was the organizer and leader under the guidelines."   Exh. E (RT at 7).   In fact, Naope was not *the* organizer and leader of the conspiracy – Mitchell was, though that might not have been uppermost in the court's mind since it had sentenced Mitchell over five years before.   Mgdesyan, however, failed to correct the misstatement.   Naope was not involved in decision-making or in

organizing the scheme.[4]

        **c.**       **Mgdesyan Was Ineffective In Failing To Object To The Sophisticated Means Enhancement.**

        **i.**       **Mgdesyan Failed To Object That A Sophisticated Means Enhancement Does Not Apply Simply Because The Conspiracy Involved, Or Co-conspirators Used, Sophisticated Means.**

A sophisticated means enhancement does not apply to a defendant simply because some part of a conspiracy involved, or a co-conspirator used, sophisticated means.   Rather, a court must look at the specific means used by the defendant himself.   See *United States v. Tanke*, 742 F.3d 1296, 1307 (9th Cir. 2014).   Naope's actions and intent were not sophisticated.   He was down on his luck and unemployed during the Great Recession.   He illegally collected unemployment checks in his own name and he let some people like family members know they also could collect unemployment simply by providing him their personal information such as name, address and age, which Naope gave to Mitchell.   Mitchell and his gang then used that information to submit false applications for unemployment.   Whether or not the means Mitchell used were sophisticated, there was no clear and convincing evidence that Naope used sophisticated means.   He should not have two points added for sophisticated means.

The PSR justified a sophisticated means enhancement, stating, "Based on the complex nature of the scheme, the high level of organization associated with the conspiracy, and the use of multiple shell companies, a two-level increase is warranted because the offense involved sophisticated means.   USSG §2B1.1(b)(10(C))."   PSR at 6.   But the fact that the nature of the scheme was complex and that the level of organization was high does not mean that Naope used, or knew there would be used, "sophisticated means."   Notably, neither Probation nor the government argued that *Naope's* actions made the nature of the scheme "complex" or the level of organization of the conspiracy "high."   Mgdesyan, however, failed to point out this distinction, and the government exploited his ineffectiveness to write to the

---

[4] In its sentencing memorandum, the government stated that at most Naope was "an organizer."   CR 50 at 1.   But at the hearing, just before the Court imposed sentence, it argued that he was *the* organizer and leader.

court, "He [the defendant] does not address the sophisticated means used to commit that offense.. . . [This is one of the] enhancements . . .   properly assessed by the probation officer and uncontested by the defendant."   CR 50 at 1 (government sentencing memorandum).

Mgdesyan also failed to correct the PSR's statement that Naope used "multiple shell companies."   As set forth above, Naope had a shell company (Sona) that he kept alive for years in the legitimate hope of selling it.   By 2009, he had sold it to Taylor. There is no evidence that he knew Taylor was going to conspire with Mitchell to create this scam. Mitchell, not Naope, used Sona (and other shell companies) to conduct his crime.   Moreover, there is no evidence that Naope used any shell company in committing his offense.   Mitchell put on Naope's unemployment application that Naope had worked for *Peco*.

> ### ii.   Use Of A Shell Company Is Not Sophisticated *Per Se*, And Is Not Sophisticated When It Is Not Used To Hide Assets Or Transactions.

When deciding whether or not a defendant used sophisticated means, courts typically look at whether the means concealed or hid illegal activity, thereby making it more difficult for law enforcement to detect the crime.   In defining sophisticated means, USSG §2B1.1(b)(10(C), states, "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."   See *Tanke*, 743 F.3d at 1307 (finding sophisticated means where the defendant engaged in "dozens of various acts" including falsifying invoices and checks to conceal payments); *United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013) (sophisticated means where the defendant used a bank account with a deceptive name to conceal income); *United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam) (sophisticated means where the defendant falsified documents and left a "complicated and fabricated" paper trail that made it hard to uncover his fraud).

Here, the shell company at issue, Sona Entertainment, had been registered for years to Naope, who paid mandatory fees on it in his own name.   Although Taylor later acquired it and Mitchell used it, Sona was not Naope's shield or means of concealment.   On the contrary, agents easily connected Sona to Naope.   See Exh. D (publically filed Sona record showing Naope listed in 2007 as both secretary and agent for service of process for Sona) (Bates 1807).

1    Naope left no "complicated and fabricated paper trail that made it hard to uncover his fraud."

2    Although the scheme itself by its nature involved deception, more is required to find that

3    Naope used sophisticated means.   Here, Mgdesyan failed to point out that the government

4    made no such showing.

5              **d.    Mgdesyan Was Ineffective In Failing To Object That Criminal
                       History Category II Overstated Naope's Criminal History.**

6              Mgdesyan failed to point out that Criminal History Category II overstates Naope's

7    criminal history.   In August 1999, about 18 years ago, Naope was convicted in the Glendale

8    Municipal Court for "Make/Pass Fictitious Check, a felony."   No further information about

9    the offense was provided in discovery or the PSR.   Naope received a probationary sentence,

10   which was terminated in July 2007, over 10 years ago.   Although Probation stated in the PSR

11   that it was waiting for the records, Mgdesyan failed to move for a continuance to obtain them.

12   Had the prior offense occurred more than 10 years before the current offense, it would not

13   have been used in determining Naope's criminal history.   However, Mitchell enticed Naope

14   into his scheme in 2009, just four months shy of the 10-year washout period.

15             In such a case – a prior offense that was 18 years old, and only four months away from

16   being un-countable – Mgdesyan was ineffective when he failed to argue that Criminal History

17   Category II overstates Naope's criminal history.[5]   Although check-passing is serious, it is not

18   as serious as many other felonies, and for that reason overstates Naope's actual criminal

19   history.   *See United States v. Valencia-Andrade*, 72 F.3d 770 (9th Cir. 1995) (driving with

20   suspended license resulted in over-statement of criminal history).   The argument, never made

21   by Mgdesyan, is that Category II overstates Naope's criminal history because the prior offense

22   occurred over 18 years before his sentencing here, because the prior offense was minor

23   enough to warrant probation, and because probation was terminated over 10 years before

24   sentencing here.

25   [5]  Naope's 2014 misdemeanor conviction for "Disturb by Loud Unreasonable Noise" was
26   three years after the offense conduct in this case.   He was sentenced to one day in jail and
     three years of probation.   No further information about the offense is provided in discovery
27   or in the PSR.   At most, that conviction generated 1 point, which would not put him into
28   Category II.

### 3. Mgdesyan's Failure To Raise The Foregoing Points Cannot Be Deemed To Be A Strategic Decision.

Mgdesyan's failure to address the errors in the PSR and in the Guidelines calculations adopted by the court was not a "strategic decision."   The plea agreement did not require waiver of (or stipulation to) any sentencing arguments.   Indeed, the government sought every conceivable enhancement in its sentencing argument.   Mgdesyan had no rational reason not to show why the Guidelines calculation should come out much lower, not to point out the factual errors in the PSR, not to ask for an evidentiary hearing on some of the Guidelines factual issues, and not to raise the need to use the clear and convincing evidence standard.

### 4. Naope Was Prejudiced By Mgdesyan's Ineffectiveness.

Had Mgdesyan made the foregoing arguments, instead of relying solely on Naope's personal circumstances to try to obtain a five-year downward departure, the lower end of the Guidelines sentence would have been far lower than 63 months, possibly as low as 12 months, *before* the court took account of issues associated with the care of Naope's children and how irreplaceable Naope is as their sole parent.   On the above showing that Naope received ineffective assistance of counsel at sentencing, his remedy is a re-sentencing.   See *Owens v. United States*, 387 F.3d 607 (7th Cir. 2004) (vacating conviction and sentence due to ineffective assistance in arguing a motion to suppress).

At the sentencing hearing, the court added a number of enhancements to the 6-level base for conspiracy to commit mail fraud: +16 for the loss amount, +4 for leadership, and +2 for sophisticated means.   These enhancements resulted in a dramatic increase in the range of Naope's sentence, thereby having a disproportionate impact.   *See United States v. McLaughlin*, 203 Fed.Appx. 891, 893 (9th Cir. 2006) (holding that a 7-level enhancement for actual loss, a 2-level enhancement for more than minimal planning, a 2-level enhancement for sophisticated means, and a 2-level enhancement for abuse of a position of trust had a disproportionate impact on a sentence for wire fraud).

Here is a comparison of the analyses under the PSR's recommendations (which the court adopted) and under the analysis Mgdesyan should have presented.[6]

---

[6]  Appendix A contains four alternate analyses that adopt some but not all of the arguments.

|  | Level (in PSR) | Proper Level |
|---|---|---|
| Base offense | 6 | 6 |
| Loss amount | +16 | +10 |
| Sophisticated means | +2 | 0 |
| Leadership | +4 | 0 |
| Early acceptance of responsibility | -3 | -3 |
| Total offense level | 25 | 13 |
| Criminal history | Category II | Category I |
| Range (before requested 5H1.6 Departure) | 63-78 months | 12-18 months |

### 5. Other Instances Of Mgdesyan's Ineffectiveness That Further Prejudiced Naope.

#### a. Mgdesyan Misstated A Key Fact.

At sentencing, Mgdesyan argued that Naope took responsibility for the offense two years after he was caught.   In fact, Naope *immediately* accepted responsibility, including confessing the very day that the agents searched his home in March 2011. Exh. B. Mgdesyan, however, seemed unaware of this fact.   See Exh. E (RT at 4) (Mgdesyan argued that Naope "has accepted responsibility as far as this case . . . my client was arrested in 2015, but there was – in 2011 is when the alleged crime occurred.   And I believe in 2013 is when they had gone to my client's house and had a search warrant or spoke to my client back then."). Neither the government nor Probation corrected this misstatement.   A few minutes later, the court imposed a five-year sentence.

#### b. Mgdesyan Ineffectively Did Not Contest Erroneous Factual Assertions Or Request An Evidentiary Hearing.

Rule 32(c)(1) requires the trial court either to make factual findings or to determine that no finding is necessary for the purpose of sentencing.   Mgdesyan, however, did not remind the court of this obligation or request a hearing to resolve disputed issues.   The only explanation for Mgdesyan's conduct is that he did not realize there were factual errors in the PSR's factual presentation and its Guidelines analysis.   Had Mgdesyan requested a hearing, the court would have been required to grant one.   *United States v. Wiora*, 1999 U.S. App. LEXIS 4041 (9th Cir. 1999); *United States v. Fernandez-Angulo*, 897 F.2d 1514, 1516 (9th Cir. 1990) (en banc). An evidentiary hearing would have resolved these factual disputes in

Naope's favor.

### c.   Mgdesyan Failed To Obtain Discovery To Make The Arguments Necessary To Show The Errors In The PSR's And The Government's Factual Presentation And Guidelines Analysis.

Mgdesyan was ineffective in not making any effort whatsoever to obtain discovery relevant to the Guidelines enhancements and no effort to gain access to sealed records (such as portions of Mitchell's and the co-conspirators' PSR's and the government's sentencing memoranda and 5K1 analyses as to Mitchell and the others) to shed light on how the government and the alleged co-conspirators characterized Naope's actions in the related cases and how the Guidelines enhancements were determined.   Such documents would bear directly on the appropriate enhancement for role, loss and sophisticated means for Naope, as well as a disparate sentencing argument.

Although Naope's new counsel has, post-sentencing, been denied access to many of these documents, other facts strongly tend to support that Mgdesyan was ineffective in failing to obtain discovery and obtain access to sealed documents relevant to sentencing.   For example, the amount of restitution ordered as to Mitchell ($5,984,318) shows that Mitchell was far more involved, and created far more loss than the $45,000 or so that Naope received.

Furthermore, according to Mitchell's own sentencing memorandum, his criminal history was Category III, higher than Naope's, and his own attorney asked for a 6-year sentence.   Although it seems apparent that Mitchell then got a reduced sentence by informing on underlings, there also is an argument that, given his much lesser role and much smaller attributable loss, Naope's sentence (60 months) was unreasonably disparate compared to Mitchell's (48 months).   But Mgdesyan made no effort to obtain the evidence that would support such an argument.

A similar argument could have been made regarding Taylor.   Although he was a "manager," according to the government, he received only 41 months.    Taylor, unlike Naope, exercised control over EDD checks, controlled the split of EDD checks with fraudulent claimants, and instructed fraudulent claimants on how to respond to law enforcement

questions (i.e., how to obstruct justice).   Taylor was also in Criminal History Category III. Mgdesyan, however, made no sentencing disparity argument and made no effort to obtain evidence to support such an argument.

> ### d.   Mgdesyan Failed To Support His 5H1.6 Request With Any Case Law.

In light of Naope's drastic change of circumstances – becoming the sole parent to his two young children after his wife's untimely death – Probation recommended a downward departure to a sentence of straight probation.   Perhaps assuming that the Court would feel sympathy for Naope and rubber-stamp Probation's recommendation, Mgdesyan's only sentencing argument was for a 63-month downward departure based on these new circumstances.   Mgdesyan, however, failed to support his argument with any case law even though the government cited cases (discussed below) that purportedly showed Naope's circumstances were not extraordinary for purposes of a 5H1.6 reduction.   CR 50 at 2-3. Indeed, Mgdesyan filed no response to the government memorandum and did not respond to the government's arguments at the sentencing hearing.   In imposing a five-year sentence, the court stated that it was relying on the government's cases, and quoting one case, stated that, "from the perspective of the defendants' children, the result may be harsh, but it is not so extraordinary a circumstance confronting sentencing judges."   Exh. E (RT 9/29/17 at 10). "It is unfortunate that the defendant has made a horrible decision, and it is a significant decision that was carried out over a considerable time that could harm his children."   *Id.* at 10-11.

Section 5H1.6(B) states that the court should consider whether,

(i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii) The loss of caretaking or financial support is one for which no effective remedial

or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv) The departure effectively will address the loss of caretaking or financial support.

The government based its position on *United States v. Leon*, 341 F.3d 928, 931-32 (9th Cir. 2003), and wrote, "It is notable that, in virtually all of the cases discuss [sic] in Leon's survey of 5H1.6, all of the defendants went to prison.   None were sentenced to probation, despite familial circumstances that were just as compelling as the defendant's situation."   CR 50 at 2.

In fact, though, in *United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994), cited in *Leon*, the defendant at issue, Gibson, did *not* go to prison and in fact was not even put on probation. Gibson had argued to the district court that his extraordinary care duties, among other reasons, supported a downward departure for him.   The court granted his request.   The government appealed, but the Court of Appeals rejected its arguments.   "We find that Gibson's truly exceptional family circumstances make this an appropriate case for a downward departure . . . Mr. Gibson has been actively involved in Mrs. Gibson's care [and Mrs. Gibson's doctor opined] that 'Mrs. Gibson would not do well if separated from the aid of her spouse, and [he] would have grave clinical concerns that her medical management could be safely continued without the ongoing presence of her spouse, even if that separation was only a matter of several weeks."   *Id.* at 797.   The Eighth Circuit remanded only because the district court also considered impermissible factors in reaching its decision.   Mgdesyan, however, did not bring this to the court's attention.

The government also omitted to mention *United States v. Dominguez*, 296 F.3d 192, 194 (3rd Cir. 2002), also cited in *Leon*.   In *Dominguez*, the Court of Appeals reversed a district court decision not to depart, stating that that district court had discretion to depart four levels where a defendant posed no risk to public safety, and was sole caretaker of her elderly parents, both of whom had health problems.   In *Dominguez*, it seemed apparent that Ms. Dominguez was *not* going to prison after the remand – the district court imposed a prison sentence only because it erroneously thought it had no discretion to depart four levels.   Again, Mgdesyan did not bring this case to the court's attention.

Of course, there are many other cases (including some cited in *Dominguez*) where

defendants received 5H1.6 departures due to their indispensable role caring for children: *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (downward departure warranted because defendant, who was solely responsible for three young children, faced extraordinary parental responsibilities); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) ("the record amply supports the conclusion that his family circumstances were extraordinary);[7] *United States v. Handy*, 752 F.Supp. 561 (E.D.N.Y. 1990) (downward departure based on impact that a longer period of incarceration would have on children of convicted single parent); *United States v. Gonzalez*, 1989 Westlaw 86021 (S.D.N.Y. 1989) (extraordinary circumstances meriting downward departure for mother of three, where father already in prison). Mgdesyan mentioned none of these cases.

The cases on which the government relied do not support its arguments – but Mgdesyan made no effort to discuss the facts in those cases.   Indeed, in *United States v. Leon,* 341 F.3d 928, 931-32 (9th Cir. 2003) itself, the Ninth Circuit had affirmed the district court in *granting a 6-level downward departure under 5H1.6*.   The result was a range reduction from 27-33 months to 10-16 months, with the court imposing eight months of imprisonment and eight months of home detention.   Moreover, Leon's family situation arguably was less compelling than Naope's.   Leon cared for his wife, who had had her kidney removed and claimed, through a psychiatrist and some other evidence, that she would commit suicide if her husband were incarcerated.   Here, Naope's young children will be without any parent at all if he is incarcerated.   The potential damage to two innocent children is incalculable.

In *United States v. Aguirre*, 214 F.3d 1122 (9th Cir. 2000), the defendant's criminal history was Category VI and she was convicted of a drug offense.   The fact that she got a 57-month sentence even *after* a large 5H1.6 departure was no surprise.   On appeal, the argument was whether she should get an even larger departure, not whether no departure was

---

[7] In *Alba*, Gonzalez's situation seemed less extraordinary than Naope's.   He and his wife had two daughters (4 and 11), and lived with his disabled father, who depended on Gonzalez to get into and out of his wheelchair, and his grandfather.   Gonzalez's wife took care of the kids and apparently also could have done Gonzalez's tasks for the older relatives. However, because Gonzalez worked two jobs to provide for his family, the court concluded that incarceration "might well result in the destruction of an otherwise strong family unit."

warranted.

In *United States v. Sweeting*, 213 F.3d 95 (3rd Cir. 2000), the defendant had five children when she committed the offense, one of whom had Tourret's syndrome. The defendant was the sole caretaker, but, unlike Naope, she committed the crime *knowing* that she was the *sole* caretaker. Although the Court of Appeals affirmed the sentence, it wrote, "It may not be unusual for example to find that a convicted drug offender is a single mother with family responsibilities [but] at some point the nature and magnitude of family responsibilities (many children? . . . no place for children to go?) may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary." As this passage indicates, having nowhere for the children to go is a reason for a downward departure. Mgdesyan never brought this passage to the court's attention.

The government cited *United States v. Leandre*, 132 F.3d 796, 808 (D.C. Cir. 1998), writing that there "the court found that while the defendant's children might be place [sic] in foster care if the defendant was imprisoned, such a situation did not meet the standard under 5H1.6. The court reasoned 'from the perspective of the defendant's children, the result may be harsh, but it is not so extraordinary a circumstance confronting sentencing judges." CR 50 at 2. The court relied on the government's uncontested sentencing memorandum, and quoted this exact language just before imposing the maximum sentence on Naope.

But *Leandre* does not hold, as the government implied, that the circumstances of children going into foster care or being split up cannot justify a reduction under 5H1.6. Rather, *Leandre* holds that, on the facts of that case, putting those children in foster care was not extraordinary enough to say that the district court had abused its discretion in not granting a downward departure. Further, *Leandre* is distinguishable.

Leandre's main argument was that the court should grant a downward departure because he had diminished mental capacity. According to a psychologist's report, he exhibited symptoms of "depressive psychosis." He had attempted suicide after experiencing hallucinations and "demeaning voices," which were "intensifying" with paranoid delusions. Leandre also had a very long, serious criminal record. On that factual record, it is not surprising that the district court might conclude that those children would be better off in

foster care.   Certainly, there was no basis to find an abuse of discretion.   Here, by contrast, Naope is a caring and responsible father.   There can be no serious dispute that Naope's children would be far worse off in foster care.

Although Mgdesyan had ample time to address and distinguish the government's cases, he made no effort to do so.   He was truly ineffective at sentencing.

## Conclusion

For the foregoing reasons and those in the Exhibits and the record, defendant Naope respectfully requests the grant of bail on appeal.

Dated: January 3, 2018                          Respectfully submitted,

                                                /s/ David A. Katz
                                                David A. Katz
                                                Counsel for Kyn Naope

### DECLARATION OF DAVID A. KATZ

I, David A. Katz, declare as follows:

1.      The facts set forth below are personally known to me, and I have first-hand knowledge of them.   If called upon to do so, I could and would testify competently to those facts under oath.

2.      I am an attorney licensed to practice law in the State of California and a member of the State Bar of California and the Bar of this Court.

3.      I am counsel for Kyn Naope in this case, CR 15-133-GEB, and in the appeal C.A. 17-10444.

4.      After the sentencing hearing, Mr. Naope retained me in October.   The available record and discovery has led me to believe there is a basis for re-sentencing due to ineffective assistance of counsel, George Mgdesyan, in his preparation for and his presentation at the sentencing hearing.   Mgdesyan's ineffectiveness includes his failure to obtain relevant discovery and to investigate and address prejudicial factual and legal errors in the PSR and in the government's sentencing memorandum and argument. I am aware of factual errors in the PSR and in the government's sentencing presentation that may have contributed to the sentencing miscues.

5.      After entering this case, I promptly contacted Naope's sentencing lawyer to obtain his file, which included the PSR and a flash drive with over 8,000 pages of discovery (but no index to the files).

6.      On November 13, I asked the government for an index, even a rough index, for the files on the flash drive and also for the case report and *Brady* material.   Exh. A. The government never responded to those requests.

7.      Mr. Naope was released on bond almost 2½ years ago, on July 31, 2015, and he has remained out of custody without incident since then.   At the sentencing hearing, Judge Burrell found that he would not flee and that he posed no danger to anyone or the community, and for those reasons permitted him to remain in the community until January 5, 2018.   I believe there has been no change of circumstances that would alter these findings.

8.      I understand that since sentencing, and bearing in mind that the PSR found there

are no suitable family members to care for his children, Naope has devoted himself to looking for a non-family solution for his child-care predicament, that the most promising possibility was his deceased wife's former roommate, one of her closest friends, and her husband, that they expressed a desire to find a way to take in his children, but that on reflection, on or about November 8 they said they could not do so, primarily because their own son has autism.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 3, 2018                    Respectfully submitted,

                                          /s/ David A. Katz                    
                                          David A. Katz
                                          Counsel for Kyn Naope

# APPENDIX A

**First alternative.**   The first alternative analysis is, were the Court to believe (or if it turns out there is discovery that has not been disclosed but which were to prove), that Naope participated in, and had criminal knowledge of, *under $200,000* in total cashed UI checks (but not the lesser amount of under $120,000). If so, that would yield +12 under the 2011 Guidelines, and would produce the following

| | |
|---|---|
| Base offense, 18 USC §371 (18 USC §1341) | 6 |
| Increase for under $200,000 as to Naope (2011 Guidelines) | +12 |
| No role adjustment | 0 |
| Early Acceptance of Responsibility | -3 |
| Total offense level | 15 |
| Criminal History | Category I |
| Range | 18-24 months |

*     *     *

**Second Alternative.**   The next alternative Guidelines analysis would not reduce the sum of Mitchell's scam down to the amount of which Naope was aware but keep it at +16, but then recognize that Naope had a *minor role* in generating a level 16 (over $1.5 million) loss, and recognize that Naope did not knowingly make "sophisticated," or knowingly add anything "sophisticated" to, Mitchell's sophisticated scheme.   This yields the following:

| | |
|---|---|
| Base offense, 18 USC §371 (18 USC §1341) | 6 |
| Increase for loss greater than 1 million dollars | +16 |
| Minor role | -2 |
| Early Acceptance of Responsibility | -3 |
| Total offense level | 17 |
| Criminal History | Category I |
| Range | 24-30 months |

*     *     *

**Third Alternative.**   The next alternative Guidelines analysis would not reduce the sum of Mitchell's scam down to the amount of which Naope was aware but keep it at +16, treat Naope as having no role adjustment up or down in generating a +16 (over $1.5 million) loss, and recognize that Naope did not knowingly make "sophisticated," or knowingly add anything "sophisticated" to, Mitchell's sophisticated scheme. This yields the following:

| | |
|---|---|
| Base offense, 18 USC §371 (18 USC §1341) | 6 |
| Increase for loss greater than 1 million dollars | +16 |
| No role adjustment | 0 |
| Early Acceptance of Responsibility | -3 |
| Total offense level | 19 |
| Criminal History | Category I |
| Range | 30-37 months |

*      *      *

**Fourth Alternative.**   Finally, in what the defense views as the worst case under any alternative Guidelines analysis, and adding +2 to Naope for Mitchell's sophisticated means:

| | |
|---|---|
| Base offense, 18 USC §371 (18 USC §1341) | 6 |
| Increase for loss greater than 1 million dollars | +16 |
| No role adjustment | 0 |
| Sophisticated means for Naope due to Mitchell's sophisticated means | +2 |
| Early Acceptance of Responsibility | -3 |
| Total offense level | 21 |
| Criminal History | Category I |
| Range | 37-46 months |

**PROOF OF SERVICE**

I, David A. Katz, am employed in the county of Los Angeles, State of California.   I am over the age of 18 years and not a party to the within action.   My business address is 433 North Camden Drive, Suite 600, Beverly Hills, CA 90210

On the date below, I served the foregoing document described as: MOTION FOR BAIL PENDING APPEAL AND FOR TEMPORARY STAY OF SURRENDER WHILE THE COURT CONSIDERS THIS MOTION MEMORANDUM, DECLARATION, EXHIBITS; APPPENDIX

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

AUSA Jared C. Dolan and AUSA Matthew M. Yelovich

U.S. Attorney's Office

501 I Street, Suite 10-100

Sacramento, CA 95814

[ ]   (BY MAIL)   I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California.

[X]   (BY PERSONAL SERVICE)   I caused such envelope to be delivered by the ECF to the addressee.

[X]   (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dated: January 3, 2018                              Respectfully submitted,

                                                                    /s/ David A. Katz_____
                                                                    David A. Katz
                                                                    Counsel for Kyn Naope